IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| Daniel Taylor,<br><br>        Plaintiff,<br><br>   vs.<br><br>Commissioner of Social Security<br>Administration,<br><br>        Defendant. | CASE NO. 5:22-cv-01635-CEF<br><br>DISTRICT JUDGE<br>Charles Esque Fleming<br><br>MAGISTRATE JUDGE<br>James E. Grimes Jr.<br><br>**REPORT &<br>RECOMMENDATION** |

Plaintiff Daniel Taylor filed a complaint against the Commissioner of Social Security seeking judicial review of her decision denying disability insurance benefits and supplemental security income. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The matter has been referred to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend the District Court affirm the Commissioner's decision.

## Procedural background

In June 2020, Taylor filed applications for supplemental security income and disability insurance benefits alleging a disability onset date of January 15, 2020.[1] Tr. 214, 221. Taylor claimed that he was disabled due to a back injury

---

[1] "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

and a learning disability. Tr. 241. The Commissioner denied Taylor's application at the initial level and upon reconsideration. Tr. 93–101, 102–10. Taylor requested a hearing before an Administrative Law Judge (ALJ). Tr. 158–59.

In July 2021, an ALJ held a hearing at which Taylor and a vocational expert testified. Tr. 58–90. A week later, the ALJ issued a written decision finding that Taylor was not disabled. Tr. 15–33. This decision became final in July 2022, when the Appeals Council declined further review. Tr. 1–9; *see* 20 C.F.R. § 404.981.

Taylor filed this action in September 2022. Doc. 1. Taylor asserts that: (1) the ALJ did not properly evaluate subjective symptom evidence under Social Security Ruling (SSR) 16-3p thus failing to support all of his findings with substantial evidence; and (2) the Appeals Council did not properly evaluate new and material evidence which should have warranted remand. *Id*.

## Factual background

### 1. *Personal and vocational evidence*

Taylor was born in October 1980 and was 39 years old on the alleged disability onset date. Tr. 27, 214. He received special education accommodations in school from 1990 until his high school graduation in 1998. Tr. 242. From 1996 through 2015, Taylor worked as a laborer in construction. *Id*. After that, he worked as an automotive technician and as a heavy equipment operator. Tr. 241. He has not worked since January 2020 due to his

back injury and the reading, writing and comprehension problems he has because of his learning disability. *Id.*

### 2. *Physical impairment medical evidence*[2]

In February 2020, Taylor established care with primary physician Yousif Alhallaq, M.D. Tr. 570–71. Dr. Alhallaq found that Taylor had a limited range of motion and tenderness in the lumbar spine. Tr. 572. Dr. Alhallaq advised Taylor to quit smoking, prescribed a muscle relaxer—Tizanidine—and steroids. *Id*. He referred Taylor to David Gutlove, M.D., for chronic pain management. *See* Tr. 388, 572.

In April, Taylor had his initial consultation with Dr. Gutlove via videoconference. Tr. 386–89. Taylor's diagnoses were lumbar degenerative disk disease, lumbar degenerative joint disease, lumbar disk herniation at L5–S1,[3] lower back pain, chronic pain syndrome, schizophrenia, bipolar disorder, and insomnia. Tr. 388. Taylor reported exercising regularly—walking three times per week—and smoking a pack of cigarettes per day. Tr. 387. He described having constant to intermittent aching, burning, sharp, and stabbing lumbar

---

[2]     This recitation of the medical evidence is not intended to be exhaustive and is limited to that which is cited in the parties' briefs

[3]     Vertebrae in a person's spine are given letter and number designations according to their location. The five vertebrae in the lower spine—the lumbar spine—are L1 through L5. *See* Thomas Scioscia, MD, Vertebrae in the Vertebral Column, Spine-health Resources, https://perma.cc/R9MM-TBZT (last visited June 27, 2023). The five vertebrae at the bottom of the spine—the sacral region—are labeled as S1 through S5. Thomas Scioscia, MD, Sacrum (Sacral Region), Spine-health Resources, https://perma.cc/S2BR-RBTB (last visited June 27, 2023).

pain radiating down his legs. Tr. 386. The pain was greater on Taylor's left side and he had weakness in his left leg. Tr. 388. Taylor had numbness and other radicular symptoms[4] in his right lumbar region, and dysesthesia[5] and paresthesia[6] in his right leg. Tr. 388. He described increasing episodes of urinary incontinence. Tr. 388–89. Standing, bending, sitting, and walking aggravated Taylor's condition, while rest and heat sometimes offered relief. *Id*. Taylor indicated that his lumbar pain affected his sleep and ability to perform the activities of daily life. *Id*. Taylor did not find physical therapy or home exercises effective. *Id*. Dr. Gutlove ordered an MRI of Taylor's lumbar spine and scheduled him to return for a follow-up in mid-May. Tr. 389.

Less than two weeks later, Taylor had the MRI of his lumbar spine as directed. Tr. 377–78. The results showed that Taylor's vertebral bodies were well-aligned with well-maintained body heights. Tr. 485. They also showed mild degenerative changes at L3–L4, mild to moderate disk height loss at L4–

---

[4]    Radiculopathy happens when the root of a nerve is compressed or irritated. *Radiculopathy*, Cleveland Clinic, Diseases & Conditions, https://perma.cc/S8UE-8FYT (last visited June 27, 2023). Radiculopathy can cause pain, numbness, or tingling in the area around the nerve. *Id*.

[5]    Dysesthesia is the term for distorted touch-based sensations. *Dysesthesia*, Cleveland Clinic, Symptoms, https://perma.cc/DBW6-SBTQ (last visited June 27, 2023).

[6]    Paresthesia is the technical term for the sensation of tingling, burning, pricking or prickling, skin-crawling, itching, "pins and needles," or numbness that can occur on or just underneath the skin. *Paresthesia*, Cleveland Clinic, Symptoms, https://perma.cc/ZY5S-FQHL (last visited June 27, 2023).

L5, degenerative disk signals at L3–L4 and L4–L5, and "minimal scattered degenerative endplate changes" with tiny nodes at "a couple of levels." Tr. 485. At L3–L4, Taylor had a small disk bulge, a mild prominence of the posterior epidural fat, and overall mild spinal canal stenosis with moderate to severe thecal sac compression[7] and significant crowding of the nerve roots. Tr. 486. Taylor had mild to moderate neural foraminal stenosis[8] at L4–L5 which was otherwise identical to L3–L4 except that there was no significant crowding of the nerve roots. Tr. 486, 487.

In mid-May, Taylor saw Dr. Gutlove. Tr. 379–85. Taylor was still walking three times per week and smoking a pack of cigarettes per day. Tr. 381. He rated the intensity of his back pain as "8–9" out of 10 but indicated that it had been a "10" on average over the past week. Tr. 380. He complained of joint pain, numbness, and tingling. Tr. 383. Dr. Gutlove found Taylor to be alert and oriented with high blood pressure and a slow, antalgic gait favoring his right leg. Tr. 384. Dr. Gutlove recorded Taylor's diagnoses as moderate to severe spinal canal stenosis at L3–L4 and L4–L5, foraminal stenosis at L3–L5,

---

[7]  The thecal sac is a protective covering that surrounds the spinal cord and helps cushion the nerves. *Thecal Sac Effacement: Definition*, Spine Info, https://perma.cc/AG5T-JYQ5 (last visited June 27, 2023). Thecal sac effacement, or narrowing, happens when something—commonly spinal stenosis (a narrowing of the spinal canal) or a protruding or herniated disk—compresses the thecal sac against the spine. *Id.*

[8]  Foraminal stenosis is compression of the spinal nerves due to a narrowing in a part of the spine. *Foraminal Stenosis*, Cleveland Clinic Diseases & Conditions, https://perma.cc/JCT6-HVGZ (last visited June 21, 2023).

lumbar facet arthropathy from L3–L5, lumbar facet syndrome, lumbar spondylosis, low back pain, lumbar radiculitis, chronic pain syndrome, schizophrenia, bipolar disorder, insomnia. Tr. 384. Taylor and Dr. Gutlove discussed Taylor's "ongoing [back] pain since 2004" due to a "worker's comp injury." Tr. 384. Taylor indicated that in 2004, a doctor in Virginia had recommended surgery, and in 2017 and 2018, a previous pain management provider had tried "trigger point [injections] and epidural steroid injections" but they offered no relief. *Id*. Dr. Gutlove informed Taylor of the minimal likelihood that selective nerve root blocks would offer a benefit to him, and suggested that Taylor schedule a consult with a spinal surgeon. *Id*. Dr. Gutlove prescribed Tramadol for pain relief and continued Taylor's prescription for Tizanidine. *See* Tr. 512.

In early June 2020, Taylor had a consult with spinal surgeon Bradley Inkrott, M.D. Tr. 624. Dr. Inkrott found that Taylor had appropriate posture with a gait that was antalgic but unassisted. Tr. 628. Taylor was unable to perform a tandem gait or "walk on tip-toe and heels" but he had a normal sit-to-stand time. *Id*. Dr. Inkrott observed that Taylor had pain with palpitation of the midline lumbar spine but no pain with palpitation on the left or right side of the lumbar spine, or anywhere along the thoracic or sacral spine. Tr. 628–29. Taylor's lumbar range of motion was full and without pain. Tr. 629. His lower right extremity had diminished sensation to light touch from the nerve distributions at L4, L5, and S1. Tr. 629. Dr. Inkrott found that Taylor's

6

lumbar spinal stenosis caused "significant" compression of the nerves in Taylor's lumbar spine and suggested that it was causing neurogenic claudication.[9] Tr. 632. Neurogenic claudication, in turn, contributed to Taylor's leg pain, numbness, and weakness, back pain, decreased walking distance, and difficulty standing, and could also affect his bowel and bladder function. *Id*. Dr. Inkrott suggested six weeks of conservative treatment—physical therapy, activity modification, oral medication, potential epidural injections—followed by surgery if the quality of Taylor's life remained unacceptable. *Id*.

Later that month, Taylor had a telehealth appointment with Dr. Alhallaq. Tr. 565–69. Dr. Alhallaq found that Taylor had limited lumbar range of motion and tenderness with palpitation. Tr. 567–68. Taylor reported worsening sharp back pain—at a severity level of eight to ten—that interfered with his ability to sleep and work. Tr. 566. Dr. Alhallaq referred Taylor to a pain management provider. Tr. 568. He advised Taylor to stop smoking, start exercising, and begin dieting. Tr. 568–69.

During a July telemedicine appointment, Dr. Alhallaq found that Taylor had limited lumbar range of motion and tenderness with palpitation. Tr. 562.

---

[9]     Neurogenic means "arising in the nervous system" and claudication is leg pain, heaviness, or weakness with walking. *Neurogenic Claudication*, Columbia University, Neurosurgery, Conditions, https://perma.cc/3XFV-N7NJ (last visited June 27, 2023). "Neurogenic claudication results from compression of the spinal nerves in the lumbar spine." *Id*.

Dr. Alhallaq suggested that Taylor lose weight through diet and exercise, advised him to stop smoking, and prescribed Ventolin for COPD[10]. Tr. 562–63.

That same month,[11] Dr. Inkrott performed spinal surgery, in the form of an L3–L5 laminectomy for lumbar decompression. *See* Tr. 36–39, 45,  57, 514, 633.

Taylor had a telemedicine appointment with Dr. Alhallaq in August 2020, during which he reported a high level of anxiety. Tr. 558. He was having night terrors and "out of body experiences" due to insomnia. Tr. 558, 559. He complained of abdominal pain turned out to be caused by an umbilical hernia. *Id*. Dr. Alhallaq referred Taylor for psychiatric care. Tr. 558. Dr. Alhallaq continued Taylor on Ventolin for COPD and advised him to stop smoking. *Id*.

In September 2020, Dr. Alhallaq observed that Taylor had a resting tremor and an irregular gait. Tr. 591. Taylor complained that despite the laminectomy, he still had lumbar back pain, numbness, weakness, and nerve pain. *Id*. Taylor mentioned that he had an upcoming follow-up with Dr. Inkrott,

---

[10]     COPD is the abbreviation for chronic obstructive pulmonary disease, a chronic inflammatory lung disease that causes obstructed airflow from the lungs. *COPD*, Mayo Clinic Diseases & Conditions, https://perma.cc/N6TL-8MBQ (last visited June 27, 2023).

[11]     The record does not contain any actual notes from the laminectomy that Dr. Inkrott performed on Taylor's spine. The surgery is, however, referenced in pre-operative treatment notes, *see*, *e.g*., Tr. 633, and post-operative treatment and discharge notes, *see*, *e.g*., Tr. 36–39, 45, 57, 514. In his July 2021 prehearing brief, Taylor's attorney claimed that Dr. Inkrott performed the L3–L5 laminectomy on July 13, 2020. Tr. 305 (citing Tr. 623–34, Dr. Inkrott's pre-operative plan).

and informed Dr. Alhallaq that he'd learned he was likely to have lifelong residual nerve symptoms. *Id*.

One to two times per week from September through December 2020, Taylor saw physical therapy assistant Melissa Russell for his lumbar pain. Tr. 431–82. Russell was treating Taylor for lower back pain, unsteadiness on his feet, difficulty walking, abnormal posture, and lumbosacral radiculopathy. Tr. 433, 435, 437, 439, 442, 444, 446, 449, 451, 455, 457, 459, 461, 463, 465, 467, 469, 471, 473, 475, 477. Primarily, Taylor rated his lumbar pain before therapy as a five to six out of ten. *See* Tr. 439, 442, 444, 449, 451 ("pain is 5–6/10 and generally stays there"), 455, 461, 463, 469, 475. His ratings ranged from as low as four, Tr. 471, 473, to as high as nine, Tr. 465 (reporting having fallen down stairs while letting his dogs out). Sometimes, he reported a decrease in pain after physical therapy. Tr. 457, 463, 465, 473, 475, 480. Other times, he denied any significant change. Tr. 431, 433, 435, 437, 440, 443, 445, 447, 450, 452, 455, 459, 461, 467, 469, 471.

In early March 2021, Taylor underwent laparoscopic umbilical hernia repair surgery. Tr. 581. Later that month, Taylor saw Dr. Alhallaq and continued to complain of ongoing lumbar pain. Tr. 548. Dr. Alhallaq found Taylor active and alert without an abnormal level of distress, although he noted Taylor's limited ambulation and described him as chronically ill. *Id*. Dr. Alhallaq found that Taylor had good insight and judgment, a normal mood and affect, limited lumbar range of motion, expiratory wheezing, abnormal motor

9

strength, and a resting tremor. Tr. 548–49. He prescribed albuterol sulfate for COPD, advised Taylor to quit smoking, and otherwise continued Taylor's prescriptions without adjustment. Tr. 549.

A few weeks later, Taylor had a follow-up with his hernia surgeon, who found Taylor calm and cooperative, not in any distress, and able to ambulate throughout the exam room and department. Tr. 581. Taylor's respirations were unlabored. *Id*. His hernia surgery incision appeared to be healing well. *Id*. Taylor reported being a current, daily smoker and indicated that he had resumed most of his normal home activities. *Id*.

During a June 2021 appointment with Dr. Alhallaq, Taylor complained of continued lumbar pain, numbness, weakness, and tingling. Tr. 548. Dr. Alhallaq described Taylor as chronically ill and noted his limited ambulation, resting tremor, irregular gait, expiratory wheezing, abnormal motor strength, limited lumbar range of motion, anxiety, and depression. Tr. 548–49.

3. *Mental impairment medical evidence*

During high school in Ritchie County, West Virginia, Taylor had an Individualized Education Plan (IEP). Tr. 314–74.

Taylor had an appointment with Dr. Alhallaq in August 2020 during which he reported a high anxiety level and described having night terrors and "out of body experiences" with his insomnia. Tr. 558, 559. Dr. Alhallaq referred Taylor to Dr. Christopher Fogarty for psychiatric care. Tr. 558.

In October 2020, Taylor had an initial consult with Dr. Fogarty. Tr. 415–20. Taylor reported a psychiatric history including bipolar depression, schizophrenia, post-traumatic stress disorder (PTSD), and anxiety, with recent night terrors. Tr. 420. Taylor said he was having nightmares of shootings and death and would wake up in a part of his home other than where he'd fallen asleep. Tr. 415. He reported having a lot of anxiety. *Id*. He said he had frequent deja-vu. *Id*.

On examination, Dr. Fogarty observed that "it [was] clear" that Taylor had "an extensive mental health history," which had been "mostly untreated over the past several years." *Id*. Dr. Fogarty found that Taylor was mildly guarded and appeared older than his stated age. Tr. 415. Taylor had an anxious mood and a mildly anxious and blunted affect. *Id*. Taylor had limited insight. Tr. 416. He had witnessed suicide and murder. Tr. 415. If Taylor felt trapped, he would become angry and lash out. *Id*. Taylor's thought process was primarily linear and logical, though he reported seeing visual hallucinations in his peripheral vision. Tr. 415, 416. Taylor told Dr. Fogarty about his learning disorder and described himself as having poor impulse control and a poor memory. Tr. 415. Dr. Fogarty prescribed Quetiapine, Venlafaxine, and Albuterol. Tr. 421. He instructed Taylor to obtain an EKG and return in one month for a follow-up. *Id*.

In November 2020, Taylor saw Dr. Fogarty and reported that he was not taking his psychiatric medications. Tr. 410. He had experienced adverse side

11

effects—excessive drowsiness and loss of appetite—from his initial dose of Venlafaxine and did not take it again. *Id*. He wasn't able to obtain Quetiapine. *Id*. Taylor's energy remained low and he had high anxiety with periodic depression. Tr. 410. Taylor denied having any violent outbursts but admitted that he had yelled at his neighbors because of noise. *Id*. Dr. Fogarty replaced Venlafaxine with Escitalopram Oxalate and continued the prescription for Quetiapine. Tr. 413.

In December 2020, Taylor saw Dr. Fogarty and reported doing well on his psychiatric medication. Tr. 409. He was sleeping well at night and his anxiety during the day had decreased. *Id*. Dr. Fogarty found Taylor pleasant and engaging, with a bright affect. *Id*. He continued Taylor's medications without adjustment and scheduled a follow-up in three months. *Id*.

### 4. Function Report

In July 2020, Taylor's mother helped him complete a function report. Tr. 248–55. Taylor indicated that his illnesses, injuries, or conditions affected his ability to lift, stand, walk, sit, squat, bend, kneel, climb stairs, reach, talk, complete tasks, concentrate, get along with others, understand things, and follow instructions. Tr. 253. The self-reporting questionnaire asked Taylor to explain how his impairments limited his ability to work. Tr. 248. He wrote that due to the severity of his back injury, he couldn't lift, bend, or twist. *Id*. His legs became numb, which made moving difficult. *Id*. He wrote that his "reading disability [hugely affected his] trying to get a job" in that he was unable to read,

write, or spell which seemed to be an ability required by every job opportunity. *Id*. The questionnaire asked what Taylor did between waking up and going to bed. Tr. 249. He reported making coffee and taking care of his dogs before mainly sitting down and watching television all day. *Id*. He was able to make himself a sandwich for lunch and a simple meal for dinner, usually canned or frozen food. *Id*.

Taylor's mother helped him complete an updated function report in March 2021. Tr. 267–74. Taylor indicated that his medications made him drowsy. Tr. 274. The symptoms and limitations Taylor described were otherwise consistent with his initial function report. *Compare* Tr. 248–55, *with* Tr. 267–74.

    5.  *State agency and other medical opinion evidence*[12]

In November 2020, Taylor saw state agency consultative examiner, E. M. Bard, Ph.D. Tr. 398–404. Taylor attributed his inability to work to back issues including ongoing pain from an injury he had sustained while working as a construction laborer. Tr. 398. Taylor also discussed his behavioral health with Dr. Bard. Taylor said that he had issues with reading comprehension due

---

[12]    When a claimant applies for disability benefits, the state agency creates a record. The record includes the claimant's medical evidence. A state agency disability examiner and a state agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the state agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the state agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

to his learning disability, and anger management issues that he started to address with a new psychiatrist. Tr. 399. He reported depression symptoms included isolating behavior and trouble sleeping. Tr. 401. He said he was also dealing with financial stress, relationship issues, and concerns over the physical restrictions his back problems caused. *Id*. Taylor admitted that he was verbally aggressive towards the television, his dogs, and—frequently—his parents. *Id*. He admitted he was prone to aggressive road rage and wasn't in an anger management group because he "wouldn't do well with others." *Id*. He said that he wasn't "currently" a violent person. *Id*.

Dr. Bard found that Taylor was able to follow directions but would have difficulty if he were expected to read and understand written directions. Tr. 404. Dr. Bard opined that Taylor's ability to sustain concentration and persistence were below average due to the distraction of his back pain. *Id*. Dr. Bard found that Taylor's overall ability to interact with others was slightly below average. *Id*. Dr. Bard classified as below average Taylor's ability to maintain effective social interaction on a consistent and independent basis with supervisors, coworkers, and the public. *Id*. Dr. Bard opined that Taylor's ability to deal with normal pressures in a competitive work setting was substandard. *Id*.

In December 2020, state agency physician Gail Mutchler, M.D., reviewed the medical evidence and found that Taylor was capable of unskilled light work with some additional limitations. Tr. 91–101. In April 2021, upon

reconsideration, state agency physician Maria Congbalay, M.D., reviewed the medical evidence and found it consistent with the initial-stage determinations. Tr. 113–32. Dr. Congbalay adopted Dr. Mutchler's findings. Tr. 131–32.

In December 2020, state agency psychologist Janet Souder, Psy.D., reviewed the medical record and found that Taylor had the mental residual functional capacity (RFC)[13] to perform work with no more than mild limitations. Tr. 108–09. In April 2021, upon reconsideration, state agency psychologist Leslie Rudy, Ph.D., reviewed the medical evidence. Tr. 116. Dr. Rudy found the evidence consistent with the initial determinations and adopted Dr. Souder's findings.  Tr. 114–16, 126.

### 6.  Testimonial evidence

Taylor and a vocational expert testified during the hearing in June 2021. Tr. 58–90. Taylor was represented by attorney Darrell Holland. Tr. 58. In 2009, Taylor was working in construction when he strained his back. Tr. 74. Since then, he has had back pain, nerve damage, and numbness in his left leg despite treatment including back surgery and physical therapy. Tr. 74–75. He can't walk for very long. Tr. 72. He said that he could only walk about 25 yards— very slowly—and he would need to rest for five minutes to go that far. *Id*. Taylor was in pain, couldn't lift anything over eight pounds and couldn't bend

---

[13]     An RFC is an "assessment of" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Circ. 2002). Essentially, it is the Social Security Administration's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

over repeatedly. *Id*. He couldn't sit for very long and had to change positions frequently. *Id*. During the hearing, Taylor had been sitting for 30 minutes and rated his pain level at a nine. Tr. 73. Taylor could generally only stand for about 10 minutes before he needed to sit, and then he wasn't able sit for very long before he needed to stand again. *Id*. He had a right hand tremor "ever[y] now and then" but otherwise no issues with his hands. Tr. 76.

Taylor discussed his intellectual limitations with the ALJ. Tr. 67–68. Taylor said that he could read and write "very minimally" and estimated that his skills were between a third and sixth grade level. Tr. 67–68. He did very well in math. Tr. 67–68. He said that being unable to competently read and write prevented him from advancing to a management position in a previous job. Tr. 77–78.

Taylor discussed his emotional problems including PTSD, anxiety, depression, and bipolar disorder. Tr. 76–77. Taylor said that he has PTSD from witnessing two suicides, one of which was violent. Tr. 77.

Taylor said that if he were employed, he would be off task more than 20% of the workday and absent four days per week because he cannot function or get out of bed. Tr. 78.

Taylor discussed how he performed his activities of daily living. Tr. 66. Taylor lived alone in a trailer home. *Id*. Taylor's mother and Taylor's neighbor helped him to do his laundry. *Id*. Taylor's neighbor also assisted Taylor with lawn care. Tr. 66–67. Taylor was able to prepare meals that were "very easy

16

and quick to cook" like ramen noodles and macaroni and cheese. Tr. 67. Taylor drove "very minimally," but could pick up groceries he ordered online and carry them in with the help of his neighbor. *Id*.

Vocational expert Diamond Warren testified. Tr. 58, 82–89. Warren testified that Taylor's job as a heavy equipment operator was skilled and required a medium level of exertion; his job as an automotive technician was semi-skilled, heavy work; and his job as a construction laborer was unskilled, generally performed with very heavy exertion per the Dictionary of Occupational Terms (DOT), and had a heavy level of exertion as performed by Taylor. Tr. 83–84. Warren opined that if a hypothetical individual with the same age, education, and work experience as Taylor had the limitations assessed in Taylor's RFC, described below, such an individual would not be able to perform any of Taylor past work. Tr. 85. Within the RFC, however, Warren said that an individual like Taylor could perform light, unskilled work like a cafeteria attendant, cleaner, or mail clerk, Tr. 85, and sedentary, unskilled work like a final assembler or an inspector, Tr. 86. Such an individual would be precluded from all work if he or she could only interact with supervisors on an occasional basis and otherwise needed to work in isolation, was off task more than ten percent of the workday, or was absent more than one day per month in excess of eight times per year. Tr. 86.

*7. Physical impairment evidence submitted after the ALJ's decision*

In January 2021, Taylor had a follow-up lumbar MRI and discussed the results with Dr. Inkrott. Tr. 36–37. The MRI "did not reveal any significant stenosis centrally," though Taylor had mild to moderate foraminal lateral recess[14] at L5–S1 and peridural fibrosis posterior to the thecal sac.[15] Tr. 36, 37. At the L4 level, Taylor had a paraspinal musculature lipoma.[16] *Id.* Dr. Inkrott wrote that Taylor was "overall" "very happy with the results of surgery" and had observed a dramatic improvement in his leg pain and weakness. Tr. 37. Dr. Inkrott noted that Taylor's incontinence was improving as well. *Id.*

In February 2021, Taylor had a follow-up with Dr. Inkrott. Dr. Inkrott found Taylor's gait non-antalgic but hesitant, Tr. 39, and scheduled a surgical debridement to drain a tract of a persistent post-operative fistula. Tr. 41.

*8. Mental impairment evidence submitted after the ALJ's decision*

In January 2022, on the referral of a vocational rehabilitation counselor, Taylor went to Career Assessment Systems, Inc., for an in-person,

---

[14]    Foraminal lateral recess is another term for foraminal stenosis. *See Lateral Recess/Foraminal Stenosis*, Northwest Medical Center, https://perma.cc/7BUF-EMBU (last visited June 27, 2023), *see also* Page 5, N 8.

[15]    Peridural fibrosis tissue is post-operative scar tissue that is common after back surgery. Larry Parker, M.D., *Scar Tissue and Pain After Back Surgery*, Spine-health Resources https://perma.cc/BX8Y-7BHQ (last visited June 27, 2023).

[16]    An intramuscular lipoma is a benign tumor deep inside of a muscle. *Intramuscular Lipoma*, Cleveland Clinic, Diseases & Conditions, https://perma.cc/22B7-PC9F (last visited June 27, 2023).

comprehensive vocational evaluation.  Tr. 44, 45. Taylor described his health as fair to poor and indicated that it varied daily. Tr. 45. The evaluator assessed Taylor's vocational behavioral skills as severely deficient. Tr. 49. The evaluator opined that Taylor's reasoning was remedial and his language was at a developmental level. Tr. 57. Taylor said that he had trouble communicating and interacting with different people, especially strangers. Tr. 49. He preferred to stay alone. *Id*. Taylor appeared physically unsteady and the evaluator noted his walking with a limp and using a handrail if available. Tr. 57. Taylor changed positions from seated to standing every 15 to 20 minutes during the four-hour evaluation, and his stamina was depleted. *Id*. Taylor reported a pain level of eight to ten at the conclusion of the evaluation. *Id*.

### The ALJ's decision

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2025.

2. The claimant has not engaged in substantial gainful activity since January 15, 2020, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3. The claimant has the following severe impairments: lumbar degenerative disk disease, disk herniation/prolapsed disk and stenosis with neurogenic claudication, radiculopathy, sciatica, and bilateral lower extremity [paresthesia]; unspecified hearing loss of the left ear; chronic obstructive pulmonary disease (COPD); schizophrenia, depressive disorder and bipolar disorder, posttraumatic stress disorder, sleep terror disorder, specific learning disability with impairment in reading and written language,

19

alcohol use disorder in remission, and cannabis use disorder in remission (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can never climb ladders, ropes, or scaffolds. He can frequently balance. He can occasionally stoop, kneel, crouch, crawl, and climb ramps and stairs. The claimant must avoid concentrated exposure to extreme cold, extreme heat, humidity, and pulmonary irritants such as fumes, odors, dusts, gases, and poor ventilation. He must avoid concentrated exposure to loud noise, and avoid all exposure to hazards, such as unprotected heights and moving mechanical parts. The claimant can perform simple, routine, and repetitive tasks that are verbally explained and/or demonstrated, but cannot perform tasks that require a high production rate pace, such as assembly line work. He can make only simple work-related decisions and should not be responsible for the safety or welfare of others. He can interact on an occasional basis with supervisors and a small group of familiar co-workers, with no more than incidental interaction with the general public. He should be limited to superficial contact meaning no sales, arbitration, negotiation, conflict resolution or confrontation, no group, tandem, or collaborative tasks, and no management, direction, or persuasion of others. The claimant can respond appropriately to occasional changes in a routine and relatively static work setting, as long as any such changes are easily explained and/or demonstrated in advance of gradual implementation.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on October 13, 1980 and was 39 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from January 15, 2020, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 20–27.

## Standard for disability

Eligibility for benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity, and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920; *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id.* "The claimant, however, retains the burden of proving her lack of residual functional

22

capacity." *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

### Standard of review

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citations omitted). The substantial evidence standard "is not high." *Id.* Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 139 S. Ct. at 1152.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469,

477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

## Discussion

*Issue 1: Whether the ALJ's findings under Social Security Ruling (SSR) 16-3p are supported by substantial evidence in the record.*

Taylor asserts that "for various reasons," the "ALJ's analysis … under SSR 16-3p is not supported by substantial evidence." Doc. 9, at 14. He first says that the ALJ's analysis of Taylor's subjective allegations is flawed and argues that "[w]ithout more of an explanation and articulation about how the evidence referenced by the ALJ supports his conclusions" the Court should find that the ALJ's decision was not supported by substantial evidence. Doc. 9, at 14. Taylor also argues that the ALJ's overall analysis is flawed and alleges that the ALJ failed to properly consider all of the SSR 16-3p relevant factors or otherwise sufficiently explain his reasoning.

Ruling 16-3p provides "a two-step process for evaluating an individual's symptoms." Social Security Ruling 16-3p Titles II And XVI: Evaluation Of Symptoms In Disability Claims, 82 Fed. Reg. 49,462, 49,463 (Oct. 25, 2017). At step one, the ALJ should "determine whether the individual has a medically determinable impairment that could reasonably be expected to produce the individual's alleged symptoms." *Id*. At step two, the ALJ should "evaluate the intensity and persistence of an individual's symptoms such as pain and

24

determine the extent to which an individual's symptoms limit his or her ability to perform work-related activities for an adult or to function independently, appropriately, and effectively in an age-appropriate manner for a child with a title XVI disability claim." *Id.* at 49,464.

Here, the ALJ found that Taylor satisfied step one. He wrote that the record reflected Taylor's history of several conditions predating the alleged onset date, including a learning disability and low average intelligence. Tr. 24 (citing Tr. 328–33,  351–57). The ALJ noted that in February 2020, Taylor complained of low back pain and exhibited limited lumbar range of motion and tenderness. Tr. 24 (citing Tr. 571, 572). The ALJ discussed Taylor's height and weight—5'8" tall and 210 pounds—and acknowledged Taylor's allegation that he could not lift, bend, or twist due to back pain. Tr. 23 (citing Tr. 248). The ALJ noted the alleged numbness in Taylor's leg. *Id.* The ALJ recognized that Taylor said he was unable to read, write, or spell. *Id.* The ALJ noted that Taylor claimed that he could only stand for 10 to 15 minutes at a time, developed leg numbness if he sat for more than 15 to 20 minutes, could walk 25 yards at most, and could only lift eight pounds without pain. Tr. 23 (citing Tr. 308). He indicated that Taylor claimed to have difficulty concentrating, following instructions, getting along with others, and completing tasks. Tr. 23 (citing Tr. 253). The ALJ discussed Taylor's self-reported poor ability to handle stress or changes in routine. Tr. 23 (citing Tr. 254). The ALJ found that Taylor's "medically determinable impairments could reasonably be expected to cause

the alleged symptoms; however, [Taylor's] statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." Tr. 23–24.

So Taylor's issue is about step two. Under step two, the ALJ is to evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ considers medical evidence, the claimant's statements, other information provided by medical sources, and any other relevant evidence in the record. *See* Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *4 (Oct. 25, 2017); 20 C.F.R. § 404.1529. Other relevant evidence includes: daily activities; the location, duration, frequency, and intensity of pain or symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication; treatment, other than medication, to relieve pain; any measures used to relieve pain; and "[o]ther factors concerning … functional limitations and restrictions due to pain or other symptoms." 20 C.F.R. § 404.1529(c). "The ALJ need not analyze all seven factors, but should show that he considered the relevant evidence." *Hatcher v. Berryhill*, 2019 WL 1382288, at *15 (N.D. Ohio Mar. 27, 2019) (citing *Cross v. Comm'r of Soc. Sec.*, 373 F. Supp.2d 724, 733 (N.D. Ohio 2005)).

Taylor asserts that the ALJ's analysis of Taylor's subjective allegations is flawed. According to Taylor, the ALJ should have provided "more of an explanation and articulation about how the evidence referenced by the ALJ

26

supports his conclusion that Taylor's statements are not entirely consistent with the medical record." Doc. 9, at 14. But Taylor doesn't explain his assertion. He doesn't say what *more* is required or why. His argument is undeveloped and perfunctory, and thus, waived. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.").

Taylor also says that the "ALJ's analysis is overall flawed" because "he failed to properly consider all relevant factors set forth in SSR 16-3p[] or otherwise sufficiently explain his reasoning." Doc. 9, at 14. Indeed, he says that "[t]he ALJ [did] not address the factors set forth in SSR 16-3p." *Id*. at 15. He adds that "the ALJ's credibility analysis fails to meet the standard of clarity described in SSR 16-3p," and "ALJ did not articulate how he evaluated Taylor's daily living activities, medications, ongoing symptoms, and the other relevant factors when evaluating Taylor's subjective complaints." *Id*. at 17. This argument is meritless. The ALJ understood the requirements of SSR 16-3p; he cited it, stated its rule, and then applied it to the facts of Taylor's case. *See* Tr. 23–26.

Despite Taylor's claims to the contrary, the ALJ considered Taylor's statements as compared to his ability to perform the daily activities of life. *See* Doc. 9, at 15; Tr. 22. For example, the ALJ wrote that although Taylor reported

that he had a learning disability with trouble following instructions, he was able to understand and follow medical advice. Tr. 22. The ALJ wrote that Taylor had adequate ability to understand and apply information such that he could pay his bills and manage his daily activities. Tr. 22 (citing Tr. 248–55). Taylor claimed to have anger issues and trouble getting along with others, however, he displayed appropriate behavior at physical exams and was able to maintain relationships with his parents, his neighbors, and friends. Tr. 22 (citing Tr. 271, 401). Also, the ALJ included, Taylor did his own shopping without difficulty. Tr. 22 (citing Tr. 251). Taylor's intelligence was below average and he claimed to have poor concentration, Tr. 22 (citing Tr. 253), but he maintained sufficient attention during medical exams and had enough concentration and persistence to pay his bills. Tr. 22 (citing Tr. 251). The ALJ included personal observations as well, noting that Taylor was able to follow the proceedings at the hearing and answer questions appropriately. Tr. 22. The ALJ identified the facts that Taylor lived alone and independently tended to his personal care needs without any indication of poor hygiene or grooming as being indicative of Taylor's ability to adapt and manage himself. Tr. 22. The ALJ appreciated Taylor's ability to perform various chores, including washing dishes and vacuuming, and noted the inconsistency when Taylor later denied being able to do chores. Tr. 22 (citing Tr. 250 (listing the various chores he performs) and Tr. 269 (asserting that he does not do house or yard work and

28

explaining why)). The ALJ also noted Taylor's ability to grocery shop and prepare simple meals. Tr. 22 (citing Tr. 249).

The ALJ considered the location, duration, frequency, and intensity of Taylor's pain and symptoms. For example, the ALJ found that Taylor had lumbar spine pain radiating into his legs with sensory changes and muscle weakness. Tr. 21. He recognized that Taylor had an impaired gait, though he noted that Taylor did not need assistance with ambulation. *Id*. The ALJ similarly acknowledged Taylor's neurogenic claudication with weakness and sensory deficits, but again highlighted Taylor's ability to ambulate independently and lack of upper extremity deficits. Tr. 21. The ALJ also added that Taylor regularly had normal motor strength, gait, station, coordination, sensation, and reflexes. Tr. 24 (citing Tr. 571, 572).

Taylor argues that the ALJ failed to consider the side effect of drowsiness caused by Taylor's medication, the fact that moving and standing or walking aggravated Taylor's condition, or Taylor's allegedly limited activities of everyday living. Doc. 9, at 15 (citing Tr. 79, 386, 410–13). But the ALJ need not discuss all the factors in Social Security Ruling 16-3p. *See Hatcher*, 2019 WL 1382288, at *15. In any event, as explained above, Taylor's claims that ALJ failed to comply with SSR 16-3p are simply not true. The ALJ explicitly followed the two-step analysis required by SSR 16-3p and found, at step two, that Taylor's statements regarding the intensity, persistence, and functionally limiting effects of his impairments were, at best, partially

consistent with the medical and other evidence. Tr. 22. The ALJ supported this finding with specific, substantial facts found in the record. Tr. 21–22. Taylor, on the other hand, fails to provide a basis for his allegations and does not demonstrate any flaw in the ALJ's reasoning or analysis.

*Issue 2: Whether Taylor's additional evidence entitled him to remand for additional proceedings.*

As noted, Taylor submitted evidence to the Appeals Council—findings from a comprehensive vocational evaluation and treatment notes from post-operative appointments Taylor had with his spinal surgeon, including the results of a lumbar spine MRI showing appropriate post-operative findings and improvement in Taylor's condition—after ALJ issued his decision. *See* Tr. 36–41, 44–57. Taylor argues that the Court should remand for consideration of this evidence. Doc. 9, at 17. The Appeals Council, however, held that Taylor's "evidence does not show a reasonable probability that it would change the outcome of the decision." Tr. 2.

The Sixth Circuit "has repeatedly held that evidence submitted to the Appeals Council after the ALJ's decision cannot be considered part of the record for purposes of substantial evidence review." *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). But remand may be appropriate "for further administrative proceedings in light of the evidence, if a claimant shows that the evidence is new and material, and that there was good cause for not presenting it in the prior proceeding." *Id*. In this context, "evidence is 'material' only if there is 'a reasonable probability that the [ALJ] would have reached a

different disposition of the disability claim if presented with the new evidence.'" *Id*. (quoting *Sizemore v. Sec'y of Health & Human Servs*., 865 F.2d 709, 711 (6th Cir. 1988)).

It's clear that there are several problems with Taylor's argument. First, although it's Taylor's burden to show that "there is 'a reasonable probability that the [ALJ] would have reached a different disposition … if presented with the new evidence," *see Prater v. Comm'r of Soc. Sec*., 235 F. Supp. 3d 876, 880 (N.D. Ohio 2017), Taylor only asserts that the "evidence *could* have convinced the ALJ." Doc. 9, at 18 (emphasis added); *see id*. at 18–19 ("It is reasonable to assume that the ALJ could have found Taylor more limited" and "It is not unreasonable to believe that the ALJ may have also found that Taylor will be off task too much.").

Second, Taylor only intermittently cites the record when describing the vocational report that he submitted. *See* Doc. 9, at 17–18. So it's unclear what portions of the report support many of his assertions. And some of Taylor's citations do not support the assertions they purport to support. For example, he says that page 53 supports the assertion that "the report noted that Taylor may not be able to complete tasks and perform activities at an acceptable rate, which could ultimately affect work quality." Doc. 9, at 18. But review of page 53 leaves one to guess the basis for Taylor's assertion.

Third, Taylor provides no basis to reach his conclusion. He does not compare his new evidence with the evidence in the record to show why it's

31

reasonably probable that the ALJ would have reached a different conclusion. And this matters because even a cursory review shows that many of the alleged contents of the report concern issues of which the ALJ was aware. *See*, *e.g.*, Tr. 22 ("He can occasionally stoop, kneel, crouch, crawl, and climb ramps and stairs" and "must avoid concentrated exposure to loud noise"), 22–23 ("cannot perform tasks that require a high production rate pace"), 23 (noting testimony that Taylor "could lift only eight pounds") 25 (reading deficits). So Taylor's argument fails. *See Prater*, 235 F. Supp. 3d at 880 ("A post-decision evaluation is not material if it is cumulative of evidence already in the record, or if it merely shows a worsening condition.").

## Conclusion

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: June 27, 2023

/s/ *James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–531 (6th Cir. 2019)